NATIONAL TUBE COMPANY *v.* UNITED STATES

No. 7923.—
Entry No. 239.

(Decided December 21, 1950)

*Gustave Springer* for the plaintiff.

*David N. Edelstein,* Assistant Attorney General (*John J. McDermott* and *Chauncey E. Wilowski,* special attorneys), for the defendant.

RAO, Judge: The instant appeal for reappraisement involves the question of the proper value of certain alterations made in Canada upon 100 pieces of wrought-iron seamless steel pipe of American manufacture. Upon its return to the United States, the pipe was entered free of duty as American goods returned, pursuant to the provisions of paragraph 1615 (g) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, at a value of $50 per ton, plus $284.47 for alterations.

The merchandise was appraised in United States currency at $50 per ton, plus $3,096.10, less incoming transportation charges of $426.37, representing the costs of further processing in Canada.

Included in said costs of further processing was the cost of certain special equipment, purchased for the account of plaintiff and used in Canada in connection with the alterations. Also included therein was an item of $100, which apparently represents the expenses of the Montreal office of Hydropress, Inc., a concern employed by plaintiff to arrange for the Canadian processing of the merchandise.

The pipe in question being concededly of American origin is exempt from duty by virtue of the provisions of paragraph 1615 (g) of the Tariff Act of 1930, as amended, which reads as follows:

Any article exported from the United States for repairs or alterations may be returned upon the payment of a duty upon the value of the repairs or alterations at the rate or rates which would apply to the article itself in its repaired or altered condition if not within the purview of this subparagraph.

Accordingly, the issue here concerns itself solely with the question of the value of the alterations effected in Canada.

From the evidence, which is not controverted, it appears that plaintiff developed a process for making a superior grade casing. After the pipe was completed, however, difficulty was encountered in straightening it. In an endeavor to ascertain whether a stretching or pulling operation would eliminate the crooks or bends in the pipe, plaintiff contacted Hydropress, Inc., of New York City, which company advised plaintiff that the only press powerful enough to stretch steel tubes was owned by the Aluminum Co. of Canada. Arrangements were thereupon made to send 50 pieces of 5-inch casing and 50 pieces of 7-inch casing to Canada as a test operation to determine whether processing by said machine was feasible.

Since the Aluminum Co.'s press was designed originally for the stretching of aluminum shapes, plaintiff was advised by Hydropress, Inc., that it would be necessary to adapt it for use in stretching and straightening steel pipe. For this purpose, an engineer employed by Hydropress, Inc., designed certain grip jaws and plugs to be used in connection with the press in the stretch-straightening operation desired by plaintiff. The cost of this special equipment which was manufactured in Canada was charged to plaintiff. It is this item which constitutes the principal point of difference between the parties to this action in arriving at the value of the alterations herein involved. On the one hand, plaintiff contends that this is capital equipment, capable of long-continued future use, although not in fact actually used after the exportation from Canada of the instant pipe, and hence that its cost should not be considered in ascertaining the value of the alterations. The Government's position is that the value of the alterations in Canada includes this nonrecurring cost, as well as any specific charge for labor, materials, and/or the use of any machine, citing *Oxford University Press, N. Y., Inc.* v. *United States*, 36 C. C. P. A. 102, C. A. D. 405.

There was received in evidence as plaintiff's exhibit 1, an invoice submitted to plaintiff by Hydropress, Inc., representing the cost of the Canadian processing. Said exhibit lists the following charges:

In connection with the test of stretch-straightening 100 pcs. of Steel Pipe, your property, at the plant of Aluminum Company of Canada, Ltd. in Kingston, Que. Canada, Sept. 4, 1946, we have been charged:

| | | |
|---|---|---|
| One Complete Set of Grip Jaws with Accessories | | $1, 489. 80 |
| Sixteen (16) Aluminum Plugs | | 678. 24 |
| Expenses of Montreal Office | | 100. 00 |
| Expenses charged by Aluminum Co. of Canada: | | |
| Labor | $291. 79 | |
| Machine charge | 109. 90 | |
| Incoming transportation | 426. 37 | |
| | | 828. 06 |
| | | 3, 096. 10 |

It further appears that when the pipe was returned to the United States, several of the tubes were found to be crooked. To determine the ultimate effect of the stretching operation, the pipe was placed in a rack for aging. After 3 months elapsed, the pipe was reexamined. It was then ascertained that practically all of the tubes had bowed, and that therefore the experiment was not successful. As a consequence, the stretch-straightening plan was abandoned, and the special equipment was never again used.

In connection with the grip jaws and plugs, there was testimony, based solely upon estimation, that they would be suitable for stretching 10,000 to 15,000 pipes before they would require reconditioning; that thereafter they could be used again for the same amount of pipe; and that the kind of reconditioning they would require would be considered maintenance rather than a major alteration of the equipment. It is inferable from this evidence that the wear and tear upon this special equipment attributable to the stretching of the involved pipe was negligible.

In both plaintiff's and defendant's briefs my attention is directed to the recent case of United States v. Wilbur G. Hallauer, 24 Cust. Ct. 568, Reap. Dec. 7804 (application for review pending), in which there was cited with approval, and properly so, the construction placed upon the term "value of the repairs" appearing in paragraph 1615 (g), supra, by the acting commissioner of customs in a letter to the collector of customs at New York, 60 Treas. Dec. 273, T. D. 45084. In said letter the commissioner stated the following:

The value of repairs should, whenever possible, be arrived at in accordance with section 402 of the tariff act of 1930, particular attention being invited to subdivision (f) of that section. When the repairs consist of labor only, and no materials, the value of the labor should be considered to be the value of the repairs. When bills are submitted showing the charges for the work done, such

bills may be used as a basis for determining the value of the repairs if the appraiser is satisfied of the correctness of the documents. Although there may not have been any cost to the importer, that is, any charge made upon him for the work done, the repairs should, nevertheless, be considered to have a value, which should be the value of the materials used and/or the labor consumed in making the repairs.

It is to be noted that the foregoing invites particular attention to subdivision (f) of section 402 of the Tariff Act of 1930, which provides for the following:

(f) COST OF PRODUCTION.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

Accordingly, I find no merit in the plaintiff's contention that the term "value of repairs" is limited to "the value of the materials used and/or the labor consumed in making the repairs." Any element which may properly fall within said section 402 (f) must be considered in determining the value of the alterations effected upon the merchandise before the court.

It appears that, while the grip jaws and plugs were designed and purchased to perform the alterations upon the particular pipe here involved, their potential usefulness was by no means exhausted when that operation was completed. Had the stretch-straightening process proved to be a feasible one, presumably many additional casings would have been subjected to it. Because it was not, the project was abandoned. Since, however, the special equipment entered into the fabrication of the alterations, some portion, at least, of its cost must, under the direction of section 402 (f), *supra*, enter into the determination of its value. Whether it be the whole cost or the proportion thereof attributable to the processing of the involved casing is therefore the ultimate issue to be here decided. In arriving at a determination of that issue, reference must be made to the case of *Oxford*

*University Press, N. Y., Inc.* v. *United States, supra.* There, the court had for consideration the question of the proper value of certain unbound books which had been printed in England. The parties having agreed that cost of production was the proper basis of appraisement, it was necessary for the court to determine whether certain nonrecurring costs, to wit, composition, editorial work, correction and proofreading, plates, translations, indexing, permission fees, and royalties should be applied to the 20,000 copies of the book which were actually printed at the time of exportation, or spread over some 65,000 copies, the printing of which from the finished plates was contemplated. In holding that the nonrecurring costs should be limited to the books actually printed at the time of exportation, the court stated:

\* \* \* No one, as far as the record is concerned, prior to the date of exportation, definitely knew the number of copies of the book which were to be printed. In the book publishing business, we think it is fair to assume that, as in any other business, the law of supply and demand is the measure of production. There is no evidence that there was any demand for 65,000 copies, and no basis upon which a court could determine the cost of production, except on the 20,000 copies that had been printed. It might very well have happened that the demand for the publication would not exceed 20,000 copies, and in such event the manufacturers and exporters would, as happens in many other manufacturing and selling industries, be left "holding the bag." Such things constantly occur in the business of manufacturing, buying and selling.

\*       \*       \*       \*       \*       \*       \*

It is quite natural, with respect to the payment of ad valorem duties, that it is to the interest of both the exporter and importer to hold down such value so that the duties to be paid upon importation will be as low as possible. That is a perfectly legitimate and proper thing to do. Such tendency, however, might result, in cases of similar nature, in the alleged estimation or calculation of costs on 100,000 or 200,000 copies of the book, which the manufacturer knew could not be sold. In that event the non-recurrent costs would be so small as to be practically negligible, and the duty assessed against that calculation would not be a proper reflection of cost of production.

It is immaterial that the dutiable value of the present importation, resulting from the action of the appraiser, may result in a lower rate of duty for subsequent importations of the same merchandise. If such a situation should arise, it seems to us that appellant would be entirely "squared off" on the total over-all costs.

The analogy between the *Oxford University Press* case, *supra*, and the case at bar is so compelling that the principle thereof must be held controlling of the question before me. Here, as there, equipment designed specially for the production of certain definite articles had an almost unlimited potential use, but only a fraction of that potential use had been expended at the time of exportation. In both cases, at the time of exportation, no one had any precise knowledge of the number of articles which would be produced by means of the equipment in question. Since the court there held that the entire cost of the special equipment was chargeable to the copies of the book actually printed at the time of exportation, it follows that the entire cost of the

grip jaws and plugs here involved is chargeable to the pipe actually subjected to the stretch-straightening process.

Counsel for plaintiff, in his reply brief, seeks to distinguish the *Oxford University Press* case, *supra*, with the following argument:

In the cited case, the costs involved represent monies expended for composition, correction, proof-reading and plates. There can be no question but that such costs are covered by the term "cost of material and/or labor". The non-recurring costs there involved covered operations necessary in the printing of a particular book. They did not represent costs of machinery equipment which could be used for the printing of any book. In the case at bar, plaintiff expended a sum of money for special machinery. This machinery was bought and designed for the straightening of countless numbers of steel pipe.

Were the converse of the proposition true, namely, that the non-recurring costs involved in the *Oxford University Press* case, *supra*, covered operations which could be utilized in the printing of any book, whereas the special machinery of the instant case could be utilized only in the stretch-straightening of a particular kind of pipe, the argument might be more convincing. More cogent reasons could be found for spreading the costs of composition, plates, editorial services, etc., over the printing of additional copies of a particular book than for spreading the cost of certain equipment over the stretch-straightening of countless numbers of steel pipes. Since, nevertheless, the court, in the cited case, limited the application of the so-called nonrecurring costs to the books actually printed at the time of exportation, *a fortiori*, the cost of the special equipment here involved must be limited to the pipe which had been actually altered at the time of exportation.

One further element remains for consideration. Plaintiff's exhibit 1 lists an item of $100 which is therein described as being for "Expenses of Montreal Office," which item was included by the appraiser in his finding of the cost of the Canadian process. While plaintiff denies that such item is properly a part of the value of the involved alterations, it has offered no proof to contradict the presumptively correct finding of the appraiser. The item may not therefore be disallowed.

In view of the foregoing, I make these findings of fact:

1. The merchandise consists of steel pipe of American manufacture returned to the United States after processing in Canada.

2. That said processing in Canada consisted of stretch-straightening the pipe in an effort to eliminate crooks and bends in the pipe.

3. That for this operation, special equipment, consisting of grip jaws and plugs, was purchased and attached to an existing press.

4. Said merchandise was entered free of duty as American goods returned, pursuant to the provisions of paragraph 1615 (g) of the Tariff Act of 1930, as amended, at a value of $50 per ton, plus $284.47 for alterations.

5. The pipe in question was appraised at $50 per ton, plus $3,096.10 for further processing in Canada, less incoming transportation charges of $426.37.

6. The charges for the alterations effected in Canada included the following items:

| | | |
|---|---:|---:|
| One Complete Set of Grip Jaws with Accessories | | $1,489.80 |
| Sixteen (16) Aluminum Plugs | | 678.24 |
| Expenses of Montreal Office | | 100.00 |
| Expenses charged by Aluminum Co. of Canada: | | |
| Labor | $291.79 | |
| Machine charge | 109.90 | |
| Incoming transportation | 426.37 | |
| | | 828.06 |
| | | 3,096.10 |

I therefore arrive at these conclusions of law:

1. The proper basis of value for the alterations to the merchandise here in question is cost of production.

2. The cost of the special equipment purchased to complete the alterations upon the involved pipe is an item which enters into the fabrication of such alterations and is therefore an element included within the cost of production thereof as defined in section 402 (f) of the Tariff Act of 1930.

3. The item listed in finding of fact numbered 6 as for expenses of Montreal office is likewise an element which enters into the ascertainment of the cost of production of the alterations in question.

4. The value of said alterations based upon their cost of production, as defined in section 402 (f) of said act, is $2,669.73.

Let judgment be entered accordingly.