(R.D. 11736)

F. W. MYERS & Co., INC. *v.* UNITED STATES

(Decided March 12, 1971)

*John C. Ray* for the plaintiff.

*L. Patrick Gray, III,* Assistant Attorney General (*Velta A. Melnbrencis,* trial attorney), for the defendant.

NEWMAN, Judge: In this appeal for reappraisement, plaintiff [1]

---

[1] Plaintiff is a customhouse broker to which the merchandise was consigned for customs clearance. Doehler-Jarvis Division of National Lead Company is the ultimate consignee of the merchandise.

challenges the Government's valuation for customs duty purposes of certain automobile parts (die castings) produced by Barber Die Castings Co. Ltd., Hamilton, Ontario, and exported in July 1962 to Doehler-Jarvis Division of National Lead Company, Toledo, Ohio. I affirm the appraisements.

The following stipulation read into the record by the parties at the trial partially sets forth the background of this action:

1. The merchandise involved herein consists of:

   a. 303 die castings, Ford channel rear door window glass lower, Part No. CIVB–5726261 L.H., manufactured in Canada by Barber Die Castings Co. Ltd., Hamilton, Ontario, and purchased by Doehler-Jarvis Division, Toledo, Ohio. The die castings were manufactured with the use of tooling No. 59–TZ–141, owned by the Ford Motor Company of Dearborn, Michigan, and exported from the United States, and furnished without charge to the Barber Die Castings Co. Ltd., which used the tooling to produce the imported 303 die castings in Canada, the tooling being subsequently reshipped to Doehler-Jarvis Division. The tooling had an original cost of $31,000.00 and an estimated productive life of 70,000 castings. At the time of the exportation of the tooling to Canada, 46,105 castings had been produced by said tooling, which had a remaining or residual estimated productive life of 23,995 castings, with a fair market value of $9,300.00.

   b. 315 die castings, Ford channel rear door window glass lower, Part No. CIVB–5726260 R.H., manufactured in Canada by Barber Die Castings Co., Ltd., Hamilton, Ontario, and purchased by Doehler-Jarvis Division, Toledo, Ohio. The die castings were manufactured with the use of tooling No. 59–TZ–140, owned by the Ford Motor Car Company of Dearborn, Michigan, and exported from the United States, and furnished without charge to the Barber Die Castings Co., Ltd., which used the tooling to produce the imported 315 die castings in Canada, the tooling being subsequently reshipped to the Doehler-Jarvis Division. The tooling had an original cost of $31,000.00 and an estimated productive life of 70,000 castings. At the time of the exportation of the tooling to Canada, 46,120 castings had been produced by said tooling, which had a remaining or residual estimated productive life of 23,880 castings, with a fair market value of $9,300.00.

2. The merchandise is not on the final list as published in T.D. 54521; there is no export or United States value; and the merchandise is properly subject to appraisement on the basis of constructed value as defined in Section 402(d) of the Tariff Act of 1930, as amended.

3. The imported merchandise was appraised as follows:

   a. The 303 die castings, Part No. CIVB–5726261, were appraised at Can. $3,193.00 per thousand units, plus U.S.

$9,300.00 for tooling cost, packed, with the tooling cost pro-rated over the 303 pieces produced. This would result in a unit value of Canadian dollars, $3.193 (U.S. $2.9595) plus a pro-rated portion of the $9,300.00 tooling cost (U.S. $30.6930) or a total unit value of U.S. $33.64 per die casting.

b. The 315 die castings, Part No. CIVB–5726260 were appraised at Can. $3,193.00 per thousand units, plus U.S. $9,300.00 for tooling cost, packed, with the tooling cost pro-rated over the 315 pieces produced. This would result in a unit value of Can. $3.193 (U.S. $2.9595) plus a pro-rated portion of the $9,300.00 tooling cost (U.S. $29.5237) or a total unit value of $32.48 per die casting.

4. The plaintiff does not contest the Can. $3.193 portion of the constructed value for each die casting but only that portion of each unit value representing the pro-rated portion of the $9,300.00 tooling cost.

5. Defendant contends that the total unit values shown in 3a, and b, are the correct constructed values for the imported merchandise.

## Statute Involved

Section 402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, provides:

For the purposes of this section, the constructed value of the imported merchandise shall be the sum of—

(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

## The Issue

What is the proper amount to be included in the unit value of each of the imported parts to reflect the cost of the tooling?

THE RECORD

In addition to the stipulation of the parties, quoted *supra*, the following additional facts appear from the testimony of three witnesses called on behalf of plaintiff; [2] Doehler-Jarvis had a contract with Ford for the production of the instant automobile parts. The tooling required for the production of these parts was owned by Ford and furnished to Doehler-Jarvis. From May 22, 1962 to July 16, 1962 Doehler-Jarvis had a labor strike at its plant in Toledo, Ohio. In order to continue supplying Ford with the instant parts, Doehler-Jarvis shipped the tooling to Barber, an affiliated company located in Hamilton, Ontario, so that the latter could produce the parts with the aid of the tooling during the period of the strike.

Although Barber's normal production was disrupted, that company continued with the manufacture of the parts during the period of the strike at Doehler-Jarvis.[3] With the use of Ford's tooling, Barber produced the 618 parts which are the subject of the present litigation.

After termination of the strike on July 16, 1962, Doehler-Jarvis brought the tooling back to its Toledo plant and continued with the production of the parts for the 1963 model season, which ended in July 1963. Thereafter, the tooling was used for the production of replacement parts for damaged vehicles. Historically, the automobile business changed the particular parts every three years.

1.

Plaintiff does not dispute that the unit value of each die casting is chargeable with a fractional part of the cost of the tooling. However, plaintiff contests the method used by the appraiser in prorating the fair market value of the tooling (U.S. $9,300.00 for each). Plaintiff insists that in arriving at the constructed unit values of the importations, such unit values were chargeable only with the pro rata portion which the imported parts numerically bore to the estimated residual productive life and fair market value of the involved tooling at the time of its exportation to Canada. Thus, plaintiff contends that the unit value of part CIVB–5726261 should include only 303/23,995 of U.S. $9,300 and that the unit value of part CIVB–5726260 should include only 315/23,880 of U.S. $9,300.

Defendant contends that the fair market value of the tooling at the time of its acquisition by the Canadian manufacturer ($9,300 each) should be prorated over the number of castings actually produced by

---

[2] Plaintiff's witnesses were: Lawrence M. Pier, credit and export manager of Doehler-Jarvis; Robert E. Moesser, plant controller for Doehler-Jarvis; and Desmond J. Cramp, secretary-treasurer and comptroller of Barber Die Casting Company.

[3] Because of the disruption of its normal operations, Barber obtained a profit on the imported parts which exceeded its "normal" profit. However, the profit element in constructed value is not in issue in this case.

Barber and exported to the United States, viz., 303 parts CIVB–5726261 and 315 parts CIVB–5726260. To buttress the correctness of the appraiser's method of allocating the tooling costs, defendant relies heavily on *Oxford University Press, N.Y., Inc. (M. Farris & Co., Inc.)* v. *United States*, 36 CCPA 102, C.A.D. 405 (1949).

In *Oxford*, the merchandise consisted of 5,000 copies of the Oxford Dictionary of Quotations in unbound form, which were part of an original edition of 20,000 copies printed at the time of exportation. In determining the cost of production, the appraiser prorated over the 20,000 copies certain nonrecurring expenses, such as composition, editorial work, correction and proofreading, plates, translations, indexing, permission fees and royalties. The importer argued that since 65,000 copies were to be printed from the plates in the ordinary course of business, the nonrecurring expenses should have been prorated over 65,000 rather than 20,000 copies to determine the proper cost of production.

Hence, the appellate court had to decide whether the entire nonrecurring costs were properly prorated over 20,000 copies, rather than 65,000 copies which the publisher contemplated would be printed. In holding that the allocation of the nonrecurring costs should be limited to the 20,000 copies actually printed at the time of exportation, the court reasoned (36 CCPA at 105):

> If the facts in this case revealed that 65,000 copies of the involved goods had been contracted for or that the Oxford University Press of London had in fact printed that number of the book in question prior to the date of exportation, a different situation would be before us.
>
> There is nothing in the record from which it could even be implied that 65,000 copies of the dictionary were to be printed. It is true, as is shown from the quoted portion of appellant's exhibit, that 47,320 copies had been printed. But as far as the United States Appraiser of Merchandise, the tribunals of the United States Customs Court and this court are concerned, at the time of the exportation, 20,000 copies only had actually been produced.
>
> * * * No one, as far as the record is concerned, prior to the date of exportation, definitely knew the number of copies of the book which were to be printed. In the book publishing business, we think it is fair to assume that, as in any other business, the law of supply and demand is the measure of production. There is no evidence that there was any demand for 65,000 copies, and no basis upon which a court could determine the cost of production, except on the 20,000 copies that had been printed. It might very well have happened that the demand for the publication would not exceed 20,000 copies, and in such event the manufacturers and exporters would, as happens in many other manufacturing and selling industries, be left "holding the bag." Such things constantly occur in the business of manufacturing, buying and selling.

Plaintiff strenuously argues that in *Oxford* there was an original printing of books in the ordinary course of business, whereas here the castings were not produced in the "ordinary course of business", but on a temporary "stopgap" basis.

While *Oxford* is distinguishable, of course, from the present case on its facts, the *ratio decidendi* of *Oxford* remains apposite. Thus, there was nothing definite respecting the number of castings which would be produced from the tooling after the date of exportation; there was no contract to supply Ford with any specific number of parts made from the tooling; and further, there is nothing in the record from which it may be implied that Ford would have purchased an additional 23,000 (plus) parts. Consequently, the rationale of *Oxford* is entirely applicable to the present case, notwithstanding the circumstances of the strike at Doehler-Jarvis. While the record establishes the temporary or "stopgap" nature of Barber's production of the parts (which factor was absent in *Oxford*), nevertheless there was no possible way at the time of exportation for the appraiser to be certain as to how many parts would ultimately be produced with the use of the tooling. Clearly, following the *Oxford* holding, the cost of tooling cannot properly be prorated over a speculative or hypothetical future production of parts.

Plaintiff also endeavors to distinguish *Oxford* on the basis of the "holding the bag" comment therein, quoted *supra*. Although in the present case Barber was in no danger of being left "holding the bag" (viz., the cost of the tooling loaned to it by Doehler-Jarvis), the owner of the tooling (Ford) would have been left "holding the bag" if no additional parts were required after these parts had been imported.

Fundamentally, in determining cost of production or constructed value, it is immaterial that someone other than the actual manufacturer of the imported goods incurred the cost of an item which goes into their production. See *Troy Textiles, Inc.* v. *United States*, 64 Cust. Ct. 654, R.D. 11697 (1970); *Ford Motor Company* v. *United States*, 29 Cust. Ct. 553, A.R.D. 9 (1952), and cases cited. The purpose of the statute is "to derive, not the manufacturer's actual cost, but the actual cost of manufacture." *Ford Motor Company, ibid.* at page 557. Accordingly, in determining the values of the parts involved herein, it is immaterial that Ford furnished the tooling without charge, and would be the actual party left "holding the bag". The tooling costs are nonetheless included in the constructed value of the parts to the same extent as if Barber had provided the tooling. Plainly, in *Oxford* the appellate court was concerned merely with the *costs* incident to being left "holding the bag", rather than with the *party* who might actually incur the costs.

2.

Plaintiff further contends that Barber did not manufacture the imported parts "in the ordinary course of business" within the meaning of section 402(d)(1). That phrase is used in connection with a time limit prior to the date of exportation for determining the costs of materials and fabrication or other processing. Plaintiff apparently believes that the provisions of section 402(d)(1) are inapplicable, since the imported parts allegedly were not produced in the *exporter's* "ordinary course of business". However, plaintiff cites no cases in support of such theory.

I do not think that the time limit specified in section 402(d)(1) was intended by Congress to be contingent upon the *particular exporter's* "ordinary course of business". In any event, since plaintiff concedes and in fact claims, that section 402(d) is applicable, plaintiff cannot now be heard to assert that one of the requirements of that section is not applicable.

3.

Finally, plaintiff refers to item 806.30 of the Tariff Schedules of the United States as apparently evidencing Congressional intent to provide for free Canadian processing of parts in event of emergencies or breakdowns in United States plants. It suffices to state that, item 806.30 has no pertinence respecting the present issue.

In summary, since plaintiff has failed to show that the appraiser's method of allocating the cost of tooling to the imported merchandise was erroneous, the appraised values are affirmed.

I find as facts:

1. The merchandise involved herein consists of:

    a. 303 die castings, Ford channel rear door window glass lower, Part No. CIVB–5726261 L.H., manufactured in Canada by Barber Die Castings Co. Ltd., Hamilton, Ontario, and purchased by Doehler-Jarvis Division, Toledo, Ohio. The die castings were manufactured with the use of tooling No. 59–TZ–141, owned by the Ford Motor Company of Dearborn, Michigan, and exported from the United States, and furnished without charge to the Barber Die Castings Co. Ltd., which used the tooling to produce the imported 303 die castings in Canada, the tooling being subsequently reshipped to Doehler-Jarvis Division. The tooling had an original cost of $31,000.00 and an estimated productive life of 70,000 castings. At the time of the exportation of the tooling to Canada, 46,105 castings had been produced by said tooling, which had a remaining or residual estimated productive life of 23,995 castings, with a fair market value of $9,300.00.

    b. 315 die castings, Ford channel rear door window glass lower, Part No. CIVB–5726260 R.H., manufactured in Canada by

Barber Die Castings Co. Ltd., Hamilton, Ontario, and purchased by Doehler-Jarvis Division, Toledo, Ohio. The die castings were manufactured with the use of tooling No. 59–TZ–140, owned by the Ford Motor Company of Dearborn, Michigan, and exported from the United States, and furnished without charge to the Barber Die Castings Co. Ltd., which used the tooling to produce the imported 315 die castings in Canada, the tooling being subsequently reshipped to the Doehler-Jarvis Division. The tooling had an original cost of $31,000.00 and an estimated productive life of 70,000 castings. At the time of the exportation of the tooling to Canada, 46,120 castings had been produced by said tooling, which had a remaining or residual estimated productive life of 23,880 castings, with a fair market value of $9,300.00.

2. The die castings were exported to the United States in July 1962.

3. The merchandise was appraised, as follows, on the basis of constructed value under section 402(d) of the Tariff Act of 1930, as amended:

    a. The 303 die castings, Part No. CIVB–5726261, were appraised at Can. $3,193.00 per thousand units, plus U.S. $9,300.00 for tooling cost, packed, with the tooling cost prorated over the 303 pieces produced, resulting in a unit value of Canadian dollars, $3.193 (U.S. $2.9595) plus a prorated portion of the $9,300.00 tooling cost (U.S. $30.6930) or a total unit value of U.S. $33.64 per die casting.

    b. The 315 die castings, Part No. CIVB–5726260, were appraised at Can. $3,193.00 per thousand units, plus U.S. $9,300.00 for tooling cost, packed, with the tooling most prorated over the 315 pieces produced, resulting in a unit value of Can. $3.193 (U.S. $2.9595) plus a prorated portion of the $9,300.00 tooling cost (U.S. $29.5237) or a total unit value of $32.48 per die casting.

4. Prior to the exportation of the tooling to Barber Die Casting Co. Ltd. in Canada, said tooling was being used in the Doehler-Jarvis Division plant at Toledo, Ohio, in the production of automobile parts, such as those involved in the instant case, for Ford Motor Company.

5. From May 22, 1962 to July 16, 1962 Doehler-Jarvis had a labor strike at its plant in Toledo, Ohio. In order to continue supplying Ford with the instant parts, Doehler-Jarvis shipped the tooling to Barber Die Castings Co. Ltd., Hamilton, Ontario, an affiliated company, so that the latter could produce the parts with the use of the tooling during the period of the strike.

6. Although Barber's normal production was disrupted, that company continued with the manufacture of the parts during the period of the strike at Doehler-Jarvis. With the use of Ford's tooling, Barber produced the 618 parts which are the subject of the present case.

7. After termination of the strike on July 16, 1962, Doehler-Jarvis brought the tooling back to its Toledo plant and continued with the production of the parts for the 1963 model season, which ended in July, 1963. Thereafter, the tooling was used for the production of replacement parts for damaged vehicles.

8. Historically, the automobile business changed the particular parts every three years.

I conclude as matters of law:

1. The correct statutory basis for valuation of the merchandise in issue is constructed value as defined in section 402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

2. The method of allocation of the cost of tooling utilized by the appraiser in finding the dutiable value of the merchandise in issue was correct.

3. The correct dutiable constructed value of the 303 die castings produced by tooling No. 59–TZ–141 is $33.64 per die casting, as appraised. The correct dutiable constructed value of the 315 die castings produced by tooling No. 59–TZ–140 is $32.48 per die casting, as appraised.

4. The appraised values are affirmed and judgment will be entered accordingly.