(C.D. 4721)

THE BENDIX CORPORATION *v.* UNITED STATES

---

[4] See also, 4 Cust. Bull. 299, T.D. 70-130(8) (1970), rulings on passenger vehicle for off-highway use; 3 Cust. Bull. 531, T.D. 69-200(18)(1969); 101 Treas. Dec. 437, T.D. 66-157(24)(1966), ruling on a vehicle in the configuration of a child's scooter, designed to carry one or two persons around a plant, operated on a rechargeable battery; 100 Treas. Dec. 826, T.D. 56535(112) (1965), ruling toboggan-type vehicles are classifiable as motor vehicles "as the term 'vehicle' encompasses any moving support or container for the conveyance of persons or articles"; 101 Treas. Dec. 292, T.D. 66-94(48) (1966), ruling on metal shopping carts similar to those used in supermarkets and grocery stores. ORR Ruling 632-69, December 24, 1969, Bureau File TE 536 V, July 7, 1969, ruling "electro drive" wheelchairs classifiable under item 692.10 TSUS.

Court No. 74-9-02469

(Decided November 30, 1977)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *James Caffentzis*) for the plaintiff.

*Barbara Allen Babcock*, Assistant Attorney General (*Herbert P. Larsen* and *William F. Atkin*, trial attorneys), for the defendant.

RICHARDSON, Judge: The merchandise in this case is covered by five entries. Entries 122939, 123348, 121566, and 120305 consist of single-speed bicycle wheel hubs incorporating brakes which were exported from Mexico in April and May, 1973, appraised, upon entry at Laredo, Texas, at U.S. $2.6554 each, including U.S. $0.2131 each for United States parts, packed, on the basis of constructed value as defined in 19 U.S.C.A., section 1401a(d) (section 402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956), and classified in liquidation under items 807.00 and 732.36, TSUS, as parts of bicycles other than frames at the duty rate of 15 *per centum ad valorem*. It is claimed by plaintiff-importer that the proper constructed value of the imported hubs is the appraised value less any amount included by the district director for start-up and preproduction costs and profit, less the value of U.S. components as appraised, and that the brakes are properly classifiable under items 807.00 and 912.10, TSUS, as drum brakes, duty free. Item 912.10 classification provides for the temporary suspension of duties on certain bicycle parts, provided for in item 732.36, including drum brakes, when entered or withdrawn for consumption on or after January 13, 1971 and up to and through December 31, 1973.

Entry 122846 consists of automotive ignition contact sets which were exported from Mexico on or about May 7, 1973, appraised,

upon entry at Laredo, Texas, at U.S. $0.6936 each, including $0.2283 each for United States parts, packed, plus $1,000 for research and development, on the basis of cost of production as defined in 19 U.S.C.A., section 1402(f) (section 402a(f), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956),[1] and classified in liquidation under items 807.00 and 683.60, TSUS, as other electrical starting and ignition equipment for internal combustion engines at the duty rate of 4 *per centum ad valorem*. Plaintiff claims that the proper cost of production value of the imported contact sets is the appraised value less U.S. $0.1313 each included for start-up and pre-production costs, with resulting adjustment made in the statutory minimum addition for profit from U.S. $0.0500 each to U.S. $0.0395 each, and less the value of U.S. components as appraised, and less $1,000 added for research and development. No classification issue is raised with respect to the ignition contact sets.

Turning first to the appraisement issues, it is appropriate to set out at length the applicable valuation statutes which read:

### Constructed Value

Section 402(d), Tariff Act of 1930, as amended:

(d) For the purposes of this section, the constructed value of imported merchandise shall be the sum of—

(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

---

[1] Finished automobile parts are among the imported articles required to be appraised under the old valuation provisions of 19 U.S.C.A., section 1402 (section 402a, Tariff Act of 1930, as amended) in accordance with T.D. 54521.

## Cost of Production Value

Section 402a(f), Tariff Act of 1930, as amended:

(f) For the purpose of this subtitle the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

On this phase of the case the record consists of an affidavit received in evidence as exhibit 1, and the testimony of two witnesses. In exhibit 1, Luis Guadalupe Salman Gonzalez, a cost accountant in the employ of Bendix Mexicana, S.A. of San Luis Potosi, Mexico, avers that he prepared cost of production figures relating to the imported merchandise on the basis of data contained in the company's books and records of which he is in charge. Exhibit 1 sets forth labor and material costs, general expenses and overhead, and costs for containers and coverings, etc. for the ignition parts and hubs in issue. Under the heading Ignition Parts (Contact Sets) exhibit 1 states:

\* \* \* \* \* \* \*

The usual general expenses or overhead in producing the ignition parts (contact sets) was $0.0721. . . . No profit was realized on the sale of the ignition parts (contact sets). . . .

And under the heading Bicycle Brakes exhibit 1 states:

\* \* \* \* \* \* \*

The general expenses incurred by Bendix Mexicana, S.A. in producing the bicycle brakes for shipment to the United States was U.S. $0.555 per unit. . . . No profit was realized in connection with the sale of the bicycle brakes.

Eugene H. Neuendorf, controller of plaintiff's bicycle and ignition components division, testified that start-up costs involved the costs to set up machines and tooling, and training personnel to run the machinery in Mexico. The witness characterized these costs as irregular or nonrecurring, and did not consider them to be part of the usual general expenses incurred in producing the subject merchandise. However, the witness had supplied data concerning such costs to customs in response to its request for additional information.

The witness testified that Bendix Mexicana made no profit on the transactions involving the importations at bar inasmuch as the cost of producing the merchandise was higher than the final selling price in the United States, a circumstance he attributed to lower selling prices of Japanese and German competitors in the United States.

It was brought out through this witness that an exchange of correspondence between the witness and five other Mexican manufacturers of the subject merchandise relative to their general expenses and profit disclosed that such information was nonexistent by reason of lack of sales for exportation to the United States by those manufacturers.

On cross-examination Mr. Neuendorf was unable to explain how costs of tooling and moving of machinery for the production of contact sets to Mexico were accounted for, and he pointed out that start-up costs continued to be incurred some 11 months after commencement of production by Bendix Mexicana. He also stated that plaintiff budgeted a certain amount of money yearly for research and development of products but was unaware if there had been any improvements in the contact sets since their initial development.

Mr. Neuendorf further testified on cross-examination that start-up and preproduction costs were costs of doing business and would have the effect of diminishing profits. He stated that Bendix Mexicana's losses were in part due to the preproduction and start-up costs and to the royalty it pays plaintiff. However, Mr. Neuendorf was not sure how the royalty expenses were being accounted for by Bendix Mexicana. Neither did he know the elements that were included in Bendix Mexicana's figure for general and administrative expenses. He testified that he relied upon the books and records which are kept by Mr. Gonzalez in San Luis Potosi, Mexico for the value information furnished to customs. Plaintiff relied upon information furnished by Gonzalez to Bendix Mexicana which in turn was submitted by it to customs.

Dr. Leslie L. McNelis, professor and director of the division of accounting at the University of Texas at San Antonio with experience as a certified public accountant, testified that part of the reason for Bendix Mexicana's losses would be the royalty payments. And he explained that as long as the transfer price from Bendix Mexicana to plaintiff was lower than direct costs to Bendix Mexicana it could

never be reasonably expected to make a profit on the merchandise herein. The witness stated that start-up and preproduction costs had to be accounted for and that the usual way was to capitalize them and charge them off against the product, which apparently was not done in this case. Professor McNelis was of the opinion that general expenses which did not include start-up and preproduction costs would be inaccurate.

The witness also was of the opinion that if current research costs were being incurred they should be included in the general and administrative expenses of a company. The witness pointed out that since Bendix Mexicana was totally owned by plaintiff, plaintiff could dictate the price at which the captive company's goods were transferred to it, and thereby determine the profitability or unprofitability of the captive company's operation.

It was established in the record that customs had rejected *pro tanto* value information regarding this merchandise which was furnished by Bendix Mexicana through plaintiff, and thereafter made the additions thereto to which the testimonial evidence was addressed.

Plaintiff argues that although start-up costs represent expenditures that were incurred in establishing the assembly plant, such costs are not directly or indirectly chargeable to the cost of producing the product, but a capital expense to be regarded as an extraordinary expense and as such not included in the category of usual general expenses. Plaintiff further contends that no addition for profit should have been made in the ascertainment of the constructed value of the wheel hubs inasmuch as Bendix Mexicana was the only manufacturer of such merchandise in Mexico for exportation to the United States, and could not have made a profit on its export transactions to the United States. Plaintiff argues, "The relationship between two parties was not the determining factor on the question of whether a profit was to be made. It appears that the sole reason for disregarding the cost information submitted by Bendix Mexicana was based upon the fact that its sales for export to the United States were to a related party." Also, plaintiff contends that the inclusion of research and development costs was not shown to be an ongoing expense but an expense incurred prior to acquisition of the ignition contact set line by plaintiff, and as such, is not properly part of the dutiable value in this case. Plaintiff argues, "There was no evidence introduced lending support to the addition made for research and development."

Defendant contends that the start-up and preproduction costs added in the appraisement of the subject merchandise come within the category of ordinary and usual costs which are properly included in a cost of production and constructed value appraisement. Defendant further contends that the failure of Bendix Mexicana to realize a profit on its export transactions to the United States was properly disregarded by the appraising officer in the ascertainment of a con-

structed value for the wheel hubs because Bendix Mexicana is a wholly-owned subsidiary of plaintiff and its failure to realize a profit is not fairly reflective of the usual profit realized. Defendant also contends that plaintiff failed to prove that the usual costs and expenses of Mexican producers of such and similar merchandise did not include research and development costs.

The court is of the opinion that the evidence fails to overcome the presumption of correctness attaching to the appraisements in issue with respect to the additions made by the appraising officers. There is no question in the court's mind but that items characterized herein as start-up and preproduction costs and research and development costs come within the ambit of ordinary general expenses, which were properly includable in a statutory constructed value or cost of production valuation, and this, irrespective of any difficulty encountered in the allocation of such expense items. See *Oxford University Press, N. Y., Inc.* v. *United States*, 36 CCPA 102, C.A.D. 405 (1949) (involving the allocation of nonrecurring costs of production such as composition, editorial, correction and proofreading, plates, translations, indexing, permission fees and royalties) and *United States* v. *Border Brokerage Co., Inc.*, 66 Cust. Ct. 639, A.R.D. 288 (1971) (involving the allocation of design and development production costs).

In the case of the constructed value formula (wheel hubs) the statutory focus of inquiry respecting such expense items is directed at the foreign expenses of producers of merchandise of the same general class or kind as the merchandise undergoing appraisement. Thus, the presumption of correctness attaching to the appraisement of the hubs presupposes an appraisement based upon a collateral valuation standard insofar as the element of general expenses is concerned. And against this criterion, it is clear that plaintiff's proofs take the wrong approach in the attempted repudiation of this element of the appraisement. The witness Neuendorf solicited, and obtained a negative response from only one Mexican manufacturer of bicycle coaster brakes concerning its general expenses and profit (collective exhibit 8) and did not establish in his testimony that this response came from the only other Mexican coaster brake manufacturer besides Bendix Mexicana. Moreover, no inquiry was directed at the ascertainment of the general expenses of Mexican manufacturers of *other bicycle parts* in keeping with the breadth of the statutory mandate. Consequently, plaintiff's proofs fall short of repudiating the presumed existence of start-up and preproduction costs in the general expenses of Mexican producers of merchandise of the *same general class or kind* for exportation to the United States and in the amounts returned in the appraisements at bar.

The same is true with respect to the item of 8% profit added to the element of general expenses in the appraisement of the wheel hubs

irrespective of the fact that Bendix Mexicana's operations were represented to the appraising officer as being profitless. And it is not a case of whether the appraising officer rejected Bendix Mexicana's statement of profit loss by reason of its subsidiary relationship to plaintiff as both parties seem inclined to speculate about, especially in view of the fact that the subsidiary's cost figures had been accepted at least in part by the appraising officer. No evidence has been adduced in the record by either party as to the appraising officer's attitude concerning the subsidiary's profit loss statement to support speculation in the matter either way. Hence, here too, as in the case of the items of start-up and preproduction costs, it must be presumed that the added profit figure reflects the amount added by other Mexican manufacturers of bicycle parts, if not coaster brakes. See *N. M. Albert Co., Inc., et al.* v. *United States*, 62 Cust. Ct. 1029, 1033, A.R.D. 254 (1969). This presumption remained wholly unrebutted by plaintiff's insufficient proofs. As defendant aptly noted, plaintiff's inquiry of only one manufacturer was inadequate to establish due diligence, and Bendix Mexicana's actual figures for general expenses and profits cannot be taken as establishing constructed value. (Defendant's brief, pp. 33–34)

In the case of the cost of production formula (contact sets) plaintiff did not adduce any evidence to establish that the item added by the appraising officer for research and development was associated with the P & D (Piffath & Danziger) operation prior to its takeover in 1966 by plaintiff. Plaintiff did not elect to call the appraising officer to testify in regard to this item. And although the witness Neuendorf was aware that plaintiff maintained an annual budget for research and development, he was unable to state whether there had been any improvements made in the contact sets since their initial development, or even if there had been any cost to plaintiff for acquisition of the company producing the contact sets. Moreover, letters of inquiry authored by Neuendorf (exhibits 5, 6, 7, 9,) indicate that there were at least four, if not more, Mexican producers of *such* or *similar* merchandise in addition to Bendix Mexicana.[2] Thus, the general expenses to be added in view of the state of this record are not those of the manufacturer *per se*, but rather the usual general expenses incurred in the production of "such or similar merchandise". *United States* v. *Henry Maier*, 21 CCPA 41, 46, T.D. 46378 (1933). Consequently, the court agrees with the defendant that the action taken

[2] The criteria considered here need not involve production of merchandise for exportation to the United States as in the case of the more limited constructed value appraisements. Hence, what this court heretofore said with respect to the presumed inclusion of start-up and preproduction costs *vis-a-vis* appraisement under the constructed value formula (wheel hubs) applies with greater force to the presumed inclusion of start-up and preproduction costs *vis-a-vis* appraisement under the cost of production formula (contact sets). The court mentions this only because plaintiff's argument against inclusion of such items of cost is directed against both valuation formulas.

by the appraising officer in making this addition is presumed to be correct in the absence of proof that research and development costs [and start-up and preproduction costs as well, for that matter,] were not a usual cost or expense incurred by Mexican manufacturers of *such* or *similar* merchandise. Plaintiff produced no such evidence in this case.

The court turns now to the classification issue in the case that involves only the rate of duty assessed against importations of wheel hubs which have been invoiced as bicycle drum brakes.

E. Elliott Hood, manager of engineering in the bicycle product line of plaintiff's bicycle and engine components division, testified that he has been with plaintiff for 45 years and was the inventor of the imported merchandise which he referred to as a "redesign of the original Bendix coaster brake". Mr. Hood explained that with the exception of a few changes in appearance the imported brake is the same brake as that which was produced domestically by plaintiff between 1970–1972. The witness described the operation of the imported brake in some detail. The brake is activated by backpedaling which applies motion resulting in expansion of two brake shoes against the inside of the hub. The resulting friction produces the braking effect.

The witness also described the operation of a coaster brake which does not employ brake shoes (exhibit 13), known as a multiple disc-type coaster brake. According to the witness' testimony, the multiple disc coaster brake employs a series of discs located in the hub, some fixed and others rotating freely, which are compressed by backpedaling to produce the braking effect. With respect to the nomenclature of imported brakes, Mr. Hood testified (R. 82):

> Q. Will you tell us whether, in your opinion, the brakes involved in this case are drum brakes?—A. The brake involved in this case, in my opinion, is a drum-type brake.
> Q. And why do you say that?—A. Primarily because the drum-type brake could be pretty well defined, and a bit of research with the bigger Bendix division in South Bend—because there are automotive-type brakes or automotive caliper brakes—A drum-type brake, in their classification, is pretty much a shoe-type brake, where the shoes are expanded outwardly against the inside diameter of a rotating drum.
> Q. Can the brake in question also be called a coaster brake?—A. The brake in question can be called a coaster brake, although I truly don't know why. But it is a term that has been used in the bicycle industry for a great number of years.

On cross-examination Mr. Hood testified that if he were to ask for a coaster brake in a bicycle shop he would probably be given the imported brake (exhibit 11) and the multiple disc-type brake (exhibit 13). It was also brought out on cross-examination of the witness that from 1970 until the transfer of production facilities to Mexico, plain-

tiff was the sole domestic manufacturer of the coaster brake, and that both before and after the transfer of production facilities to Mexico plaintiff advertised the imported brakes in trade journals as "coaster brakes". Also, Mr. Hood identified a copy of a patent issued in his name for the imported merchandise (exhibit B) in which reference is made to the brake as a "coaster brake". However, Mr. Hood explained that the decision to call it a coaster brake was made by the patent attorney.

On redirect examination Mr. Hood testified that he knew that there are French and Japanese sources that market a drum brake and advertise it as such. He described the operation of the French drum brake which is in evidence as exhibit D. According to the witness exhibit D functions by means of a handlebar cable control operating on an external level which rotates a cam that expands two brake shoes revolving around a common pivot against the inside of a drum.

John Forester, an industrial engineer by profession, and a bicycle enthusiast, author, professor and consultant in the area of bicycle traffic engineering, testified that a drum brake is a brake which, like an automobile brake, has shoes located internally to a drum. The shoes, which usually consist of asbestos and an organic binder, are attached inside the drum but outside of the hub shell and entirely separate from the lubricated workings of the hub shell. Drum brakes are usually activated by a cable, but sometimes by a rod. According to Mr. Forester exhibit D is a rear drum brake and would be so identified in a bicycle shop. The witness testified that drum brakes were not produced domestically during the period from 1970 to the present time.

Mr. Forester identified the imported brakes (exhibit 11) and the multiple disc brake (exhibit 13) as coaster brakes while being aware of the differences in their construction. He stated that he had never seen a consumer, an advertisement, a bicycle shop, or a trade journal refer to a coaster brake as a drum brake. He testified that in his lifetime of experience with bicycles he had never heard anyone other than Mr. Hood refer to exhibit 11 as other than a coaster brake.

Plaintiff contends that due to the fact that the imported merchandise contains brake shoes which expand against a rotating hub or drum it is proper to consider them, in terms of their braking mechanism, as a drum-type brake. Plaintiff further contends that classification of the imported merchandise as drum brakes is consistent with the congressional purpose underlying item 912.10 to aid the competitive position of American bicycle manufacturers, in view of the established fact that domestic production of bicycle brakes is nonexistent.

Defendant contends that the imported brakes are commonly known as coaster brakes. Defendant also contends that Congress did not in-

tend to include the imported coaster brakes under item 912.10 classification.

The court agrees with defendant. The evidence in the record is overwhelming that the braking mechanism in the imported wheel hubs is commonly known as a bicycle coaster brake. Moreover, plaintiff's witness Hood didn't even consider the braking mechanism in the imported merchandise to be a "drum brake" *per se*. At best he considered the braking mechanism to be a *drum-type* brake, and this only because it operates on the "expanding-shoe-type principle", to use his words. However, it is well settled that tariff terms are not drafted in accordance with their technical and scientific meaning but in accordance with their commercial and common meanings. See *Meyer & Lange et al.* v. *United States*, 6 Ct. Cust. Appls. 181, T.D. 35436 (1915); *Central Commercial Co. et al.* v. *United States*, 11 Ct. Cust. Appls. 131, T.D. 38935 (1921); *Chester K. Stoner* v. *United States*, 42 Cust. Ct. 178, C.D. 2083 (1959). And since the braking mechanism at bar is commonly known as a coaster brake, and is not commonly known as a drum brake, it was properly classified under the broad provision for bicycle parts in item 732.36, there being no provision in item 912.10 for coaster brakes *per se.*

In fact, the legislative history underlying item 912.10 reveals that Congress enacted the statute so that domestic bicycle manufacturers could compete more favorably with their foreign counterparts by importing duty free various parts not manufactured in this country. See 3 U.S. Cong. & Admin. News '70, pp. 6115–6116; coaster brakes *per se* were excluded from the measure since they were then being manufactured in this country. In this connection the Senate Finance Committee Report [S. Rept. No. 91–1536 on H.R. 19670, 91st Cong., 2d Sess. (1970)] states:

> The committee is informed that with the exception of coaster brakes and click stick levers the parts and accessories imported under TSUS item 732.36, on which the duty would be suspended temporarily, are not produced domestically. With regard to coaster brakes, which are produced in the United States, the bill would assure that only coaster brakes that are physically joined to three-speed hubs would be accorded duty-free entry. . . .

Hence, the imported wheel hubs at bar which incorporated the coaster brakes in dispute are of the single speed variety, and as such, were never intended to be accorded the duty exemption provided for in item 912.10.

For the reasons stated plaintiff has failed to sustain the issuable allegations of the complaint, and the action must, therefore, be dismissed. Accordingly, on the reappraisement issues the court finds as facts:

1. That the merchandise in this action consists of single-speed bicycle rear wheel hubs incorporating coaster brakes and automotive

ignition contact sets exported from Mexico between April 4, 1973 and May 7, 1973.

2. That said merchandise was appraised upon entry at the port of Laredo, Texas, (a) as to the wheel hubs, on the basis of constructed value as defined in 19 U.S.C.A., section 1401a(d) (section 402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956) at U.S. $2.6554 each, including U.S. $0.2131 each for United States parts, and (b) as to the contact sets, on the basis of cost of production as defined in 19 U.S.C.A., section 1402(f) (section 402a(f), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956) at U.S. $0.6936 each, including U.S. $0.2283 each for United States parts, plus $1,000 for research and development.

3. There is no evidence in the record that the items of start-up and preproduction costs and profit, in the case of the wheel hubs, and the items of start-up and preproduction costs and research and development costs, in the case of the contact sets, were improperly added in the appraisement of said merchandise.

Upon these facts the court concludes as matters of law:

1. That constructed value as defined in section 1401a(d) and cost of production as defined in section 1402(f) are the proper bases for determination of the values of the merchandise herein.

2. That plaintiff has not established a constructed value or a cost of production value different from that returned in the appraisement of said merchandise.

3. That the appraised values of said merchandise remain in full force and effect by reason of plaintiff's failure to overcome the presumption of correctness attaching to the appraisements herein.

Judgment will be entered accordingly.