CHRYSLER CORP., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Consolidated Court No. 88–03–00249

(Dated September 22, 1993)

*Barnes, Richardson & Colburn, (Robert E. Burke* and *Lawrence M. Friedman),* for plaintiff.
*Frank W. Hunger,* Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, *(Bruce N. Stratvert), Edward N. Maurer,* of counsel, United States Customs Service, for defendant.

## MEMORANDUM OPINION

GOLDBERG, *Judge:* Plaintiff challenges the appraisal of merchandise imported from France and described as 1.6 liter automobile gasoline engines. The Customs Service ("Customs") appraised the merchandise at its invoice value with F130 added per unit. Plaintiff asserts proper valuation is at the merchandise's invoice value alone. In a counterclaim, defendant claims that payments made by plaintiff for tooling modifications were part of the price paid for the merchandise, and therefore part of its appraisal value. Plaintiff argues the payments were statutory assists. The court holds that the proper transaction value of the merchandise was its invoice value alone, and that tooling-related payments made by plaintiff were not statutory assists. The court issues judgment for plaintiff on its complaint and judgment for defendant on its counterclaim, and orders reliquidation.

## BACKGROUND

Plaintiff Chrysler Corporation is the importer of record of the subject merchandise, 1.6 liter gasoline engines, exported to the United States from France during June, 1983 through July, 1985. The products were exported pursuant to a succession of contracts between plaintiff and Automobiles Talbot, a French manufacturer of automobile engines. Specifically, plaintiff and Automobiles Talbot negotiated a series of agreements and amendments, (collectively "the Agreements"), by which plaintiff purchased the subject merchandise for use in its automobiles. The Agreements were comprised of an Engine Purchase Agreement Between Chrysler Corporation and Automobiles Talbot Dated July 22, 1980 ("Original Agreement").[1] The Original Agreement was subsequently amended by the "Amendment Dated May 26, 1981 to the Engine Purchase Agreement Between Chrysler Corporation and Automobiles Peugeot Dated July 21, 1980" ("Amendment"). The parties then drafted a revised agreement on May 26, 1981 similarly entitled "Engine

---

[1] After execution of the Original Agreement, Automobiles Talbot was absorbed by Peugeot S.A. Peugeot S.A. then replaced Automobiles Talbot as the principal party to the Agreements.

Purchase Agreement Between Chrysler Corporation and Automobiles Talbot dated July 21, 1980," ("Revised Agreement"), which incorporated alterations made in the Amendment into the Original Agreement.

Article 3 of the Revised Agreement provided that:

3.1 TALBOT undertakes to sell and deliver for each model year (hereinafter referred to as "M.Y.") the maximum volume of Engines set forth below for three model years.

—from June 1982 through M.Y. 1983 : 120,000
—M.Y. 1984 : 120,000
—M.Y. 1985 : 120,000

  *  *  *  *  *  *  *

3.2 CHRYSLER undertakes to purchase and take delivery of the following minimum volumes in each model year:

—M.Y. 1983 : 70,000
—M.Y. 1984 : 70,000
—M.Y. 1985 : 70,000

Article 6.1 of the "Price and Terms of Payment" portion of the Revised Agreement provides that "[e]ach Engine shall have a base price in French francs as defined in Annex 2, such price being for a [ ] bare Engine * * *."[2]

Annex 2 of the Revised Agreement states:

I. *Base Price of Reference—General Principles*

For an anticipated three-year period (i.e. the life of the Agreement * * *) the base selling price of reference of the Engine * * * within the minimum/maximum volumes mentioned in Article 3 of this Agreement, is of FF. 3,100, value as of January 1st, 1980, subject to adjustments for economics as per the formula set out here below, such adjustments, when applicable hereunder, will be referenced to as the "economic adjustments." All sums referred to herein as being subject to such "economic adjustments" will be finally adjusted as of the relevant TALBOT invoice date. This price will apply to the first 210,000 Engines purchased and paid for by CHRYSLER from TALBOT, provided delivery of the first 70,000 Engines as per Article 3.1 of this Agreement is made no later than by August 31, 1983. The base price of each Engine delivered by TALBOT to CHRYSLER over and above the initial 210,000 Engines will be reduced to FF. 3020 Engine, value as of January 1, 1980, subject to "economic adjustments[3]."

II. *Special Applications*

1) In case CHRYSLER failed to take delivery of the first 100,000[4] Engines on or before August 31, 1983 and TALBOT was capable

---

[2] At trial, Mr. Greene stated that the term "bare engine" was synonymous with the phrase "base engine." He defined a "bare" or "base" engine as an incomplete motor with a block, head, and cylinder, but missing several components. Trial Tr. at 28–29.

[3] Economic adjustments are "changes that happen in the marketplace relative to cost of labor, relative to the cost of materials, that effect that price on an ongoing basis * * *." Trial Tr. at 33. These adjustments are made on a quarterly basis.

[4] Uncontroverted evidence at trial showed that the number 100,000 was a typographical error. The figure should have read 70,000. *See* Trial Tr. at 70–71.

and willing to deliver such Engines, CHRYSLER agrees to pay TALBOT an incremental sum of FF. 19,000,000 (i.e. FF. 271.42 x 70,000 Engines) of said volume by November 1, 1983 * * *.

\*     \*     \*     \*     \*     \*     \*

III. *Shortfalls*
1) *Limited Shortfalls*
TALBOT will allow CHRYSLER a maximum shortfall of up to 10,000 Engines below the minimum volumes set forth in Article 3.2 with respect to each model year. CHRYSLER will be able to carry forward such shortfalls from one model year to another within the limits of Article 3.1 If, at the end of the third model year (1985) there remains a balance of shortfall Engines, the Agreement will be automatically extended for a period of up to one model year (1986), during which CHRYSLER will take delivery from TALBOT of such balance of Engines on the basis of a delivery schedule to be determined by the parties, it being acknowledged that the total shortfall will not exceed 30,000 Engines. If, for any reason, other than TALBOT'S inability or unwillingness to deliver the Engines, the shortfall is not delivered to and paid for by CHRYSLER before the end of the 1986 model year, CHRYSLER undertakes to pay TALBOT within sixty (60) days a compensation amounting to FF. 130 per unit for each shortfall Engine not purchased and paid for during the 1986 model year extension. Such compensation value will be subject to "economics adjustments."

\*     \*     \*     \*     \*     \*     \*

2) *Excess Shortfalls*
In case the Engine delivery shortfall in any given model year exceeded for any reason the 10,000 Engine volume variance provided for above, CHRYSLER will pay TALBOT a compensation amounting to FF. 130 per unit for each excess shortfall Engine, such sum to be payable to TALBOT within sixty (60) days following the end of any given model year. Such compensation value will be subject to "economics adjustments."

The uncontested evidence at trial showed that plaintiff purchased 16,080 engines during model year 1983, or 53,920 below the contracted amount of 70,000. Trial Tr. at 60–61. Because the contract provided that 10,000 could be carried over, plaintiff was responsible in 1983 for paying F130 for 43,920 engines, with economic adjustments, for a total of F8,002,242. Trial Tr. at 61–62.

Unrebutted evidence also demonstrated that in model year 1984, plaintiff purchased 24,800 engines, which left a shortfall of 35,200 engines beyond the 10,000 which plaintiff could carry over. Trial Tr. at 63–64. Consequently, plaintiff owed Peugeot F7,043,468 (F130 x 35,200, with economic adjustments), which it paid. Trial Tr. at 63. In model year 1985, 16,602 engines were purchased, leaving a deficit of 43,398 exclusive of 10,000 engines carried over by plaintiff. Trial Tr. at 66. Plaintiff's financial responsibility in 1985, including economic adjustments, totalled F9,235,314.

Finally, in model year 1986, plaintiff was responsible for the 30,000 engines carried over from 1983–1985. In that year, plaintiff purchased 7,256 engines, which left a shortfall of 22,744 engines. Trial Tr. at 68. As a result, plaintiff paid Peugeot F4,936,691 for the remaining shortfall. In total, plaintiff paid F29,217,715 in shortfall fees.

In addition, the evidence showed that plaintiff did not purchase 70,000 engines by August 31, 1983 as provided by the Special Applications section of the Revised Agreement. Trial Tr. at 71. Consequently, plaintiff paid Peugeot approximately F27,700,000, inclusive of economic adjustments, pursuant to a subsequent settlement reached between plaintiff and Peugeot regarding the Special Applications provision of the Revised Agreement. Trial Tr. at 71–73.

Plaintiff and defendant also stipulated to several facts during the trial. Specifically, they agreed that plaintiff made two payments totalling $159,897.00 to Peugeot on December 1, 1983 for tooling-related modifications. The tooling expenses arose out of two 1983 purchase orders sent to plaintiff. On the purchase orders, the costs were described as "one-time running investment charges" for revising specified engine parts or functions. *See* Tool Purchase Orders, Plaintiff's Exhibit Y.

Upon entry to the United States, Customs appraised the engines at their invoice value, plus F130 per unit. Plaintiff filed timely protests, which were denied in October and November, 1987. Plaintiff then filed a complaint with this court on March 31, 1989, asserting that the proper appraisal value of the merchandise was invoice unit value plus the value of any assists, but without the additional amount of F130 per engine. Plaintiff therefore sought reliquidation and refund.

Defendant filed an answer on July 3, 1989, and an amended answer with counterclaim on December 27, 1990. In its counterclaim, defendant asserted that Customs under-calculated the appraisal value of the merchandise. In fact, the proper appraisal value was the invoice price of the engines including pro-rated percentages of the shortfall and Special Application fees. Defendant also claimed that the appraisal value should include all tooling and manufacturing-related charges paid by plaintiff, and for which duty had not been paid.

Trial was held in this action on May 5, 1993 in Chicago, Illinois. At trial, plaintiff called three witnesses, Lawrence T. Greene, Michael P. Ciccone, and Pierre H. Gagnier. At the time of trial, Mr. Greene was Executive Vice President for procurement and government affairs at Diamond Star Motors Corporation. Between 1978 and 1983, he was employed by plaintiff as a general purchasing agent, manager of quality and reliability, and administration manager, with responsibility for contract administration. In addition, he was the principal negotiator for plaintiff during purchase of the engines. Mr. Ciccone, who is presently plaintiff's executive engineer in its large car platform program, was a purchasing manager and purchasing agent for plaintiff between 1980 and 1986. Finally, during the early 1980's, Mr. Gagnier acted as the finance liaison executive for plaintiff.

Defendant did not call any witnesses on its behalf at trial. Both parties submitted post-trial briefs concerning whether tooling and manufacturing costs paid by plaintiff were statutory assists, and how these expenses should be allocated for duty purposes.

DISCUSSION

Pursuant to 28 U.S.C. § 2639(a)(1) (1988), Customs' appraisal value is presumed to be correct and the burden of proof is upon the party challenging the decision. "If the intent of Congress is clear [from the language of the statute], that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Resources Defense Council Inc.,* 467 U.S. 837, 842–843 (1984). However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

In this case, two issues are presented for determination. The court must first decide whether appraisal value of the merchandise properly includes shortfall and Special Application charges. The court must also determine whether tooling and manufacturing costs paid by plaintiff were statutory assists, and the proper method of allocation of these expenses.

A. *Appraisal Value of the Merchandise:*

Defendant argues that the transaction value of the engines should include pro-rated percentages of the shortfall and Special Application fees paid by plaintiff. Defendant grounds its contentions on the language in Annex 2 of the Revised Agreement that "the base selling price of reference of the Engine * * * within the minimum/maximum volumes mentioned in Article 3 of this Agreement, is of FF. 3,100, value as of January 1st, 1980." Defendant asserts that "[i]f the minimum volumes were not purchased, then in effect the selling price for those that were purchased increased [because shortfall and Special Applications fees were added]. That incremental price, therefore, represents a part of the total payment made by Chrysler for the engines. Thus, it is dutiable as part of the price paid or payable." Defendant's Pretrial Memorandum at 8.

Plaintiff asserts the shortfall and Special Applications fees were not related to the price of the imported merchandise. They were instead a form of liquidated damages assessed for its failure to fulfill its obligations under the Agreements.

Title 19 United States Code, Section 1401a (1988) provides that imported merchandise shall be appraised on the basis of the transactional value of the product. The transactional value is defined as under 19 U.S.C. 1401a(b)(1) (1988) as:

the price actually paid or payable for the merchandise when sold for exportation to the United States, plus amounts equal to—
(A) the packing costs incurred * * *;
(B) any selling commission incurred * * *;

(C) the value, apportioned as appropriate, of any assist; * * *.

Title 19 United States Code, Section 1401a(b)(4) (1988) further states that:

(A) The term "price actually paid or payable" means the total payment (whether direct or indirect, and exclusive of any costs charges, or expenses incurred for transportation, insurance, and related services incident to the international shipment of the merchandise from the country of exportation to the place of importation in the United States) made, or to be made, for imported merchandise by the buyer to, or for the benefit of, the seller.

In addition, Customs' implementing regulations regarding transaction value provide that:

(a) *Price actually paid or payable—*
(1) *General.* In determining transaction value, the price actually paid or payable will be considered without regard to its method of derivation. It may be he result of discounts, increases, or negotiations, or, may be arrived at by the application of a formula * * *.

19 C.F.R. § 152.103 (1993).

In *Generra Sportswear Co. v. United States*, 8 Fed. Cir. (T) 132, 135, 905 F.2d 377 (1990), the court held that:

[a]s long as the * * * *payment was made to the seller in exchange for merchandise sold* for export to the United States, the payment properly may be included in transaction value, even if the payment represents something other than the *per se* value of the goods. The focus of transaction value is the actual transaction between the buyer and the seller * * *.

(Emphasis added.)

The court finds that in this case, no evidence was presented to show that the shortfall and Special Application costs were part of the "price actually paid or payable for the merchandise."

Most importantly, in connection with the shortfall provision, the contract on its face provides that F130 were due from plaintiff to Peugeot for each engine *not purchased* by 1986. By the terms of the Agreements, then, shortfall fees were in the nature of a contractual "penalty," since they accrued each time plaintiff failed to buy an engine. An expense arising from the *failure* to purchase certain merchandise is not a component of the price paid for the acquisition of *other* products.

Similarly, the Special Applications provisions required plaintiff to pay a set fee should it decline to purchase 70,000 engines by August 31, 1983. This amount was calculated by multiplying F271.42 times the numbers of engines plaintiff contracted to buy. Here again, plaintiff's financial responsibility was triggered by its *failure* to purchase engines. The absurdity of assuming the Special Applications fee was part of the price paid for the subject merchandise is best illustrated by pointing out that plaintiff was responsible for this same fee regardless if it purchased one, ten, or no engines. Taking defendant's position to its logical end, if no

engines were purchased, the Special Applications fee would be non-dutiable because it was not part of the price paid or payable for imported merchandise. Purchase of a single engine by plaintiff, however, somehow transforms the identical Special Applications fee into a dutiable aspect of the price paid for that engine. Moreover, the price paid for that single imported engine would include the *entire* Special Applications fee of F27,700,000. The court cannot countenance such an absurd and unfair result.

Unrebutted testimony at trial also validates this reading of the agreement. Uncontradicted evidence showed that the purpose of the shortfall and Special Applications fees were for Peugeot to recover certain fixed costs, including tooling and launch expenses in the event plaintiff *refused* to purchase the contracted for number of engines. Trial Tr. at 45–47. In connection with shortfall fees, the evidence demonstrated that plaintiff made payments for model years 1983–1986 based upon the number of engines *not* purchased. Specifically, Mr. Greene stated that for every engine less than 70,000 which plaintiff failed to buy, plaintiff paid Peugeot a fee of F130. Mr. Greene also testified that the shortfall provision "had no effect on the price of the base price of the engine[s] [purchased]—none at all." Trial Tr. at 40.

In addition, the evidence showed that Special Applications fees were unrelated to the cost of the engines purchased. Mr. Greene testified that plaintiff would have remained liable for these fees if it purchased no engines, or a single one. Trial Tr. at 49. Mr. Ciccone also testified that the fees paid in settlement of the Special Application charge had "[n]o effect whatsoever on the price of the engine * * *. No additional engines were imported[   ]" as a result of the payment. Trial Tr. at 75.

The uncontroverted evidence also showed that plaintiff's internal accounting methodology treated shortfall and Special Application costs as unrelated to the initial price of the engines. Mr. Gagnier testified that costs for *purchase* of the engines would be treated as "simply production material that was shipped into the [plant] and the entries appropriate to that flow of commerce would be to charge [the] *inventory* [account] and to set up a liability for the normal payment and the commercial terms of the payable generated by receipt of the engines." Trial Tr. at 104 (emphasis added).

Mr. Gagnier noted that payment for the engines was controlled by "the purchase order issued by procurement and supply, and the invoices that are rendered by the supplier. [For example,] if the purchase order says the engine is $800.00 and the supplier's invoice is $800.00, then that's what gets paid and that's what [is] enter[ed] into the *inventory* account at the plant location." Trial Tr. at 108 (emphasis added).

Mr. Gagnier stated, in contrast, shortfall payments were accounted for separately, and not charged to inventory accounts. He testified that plaintiff maintained a corporate ledger account from 1983–1986, from which shortfall payments were made to Peugeot during those years. The payments were initially charged to a "P&O account called 'Material Ob-

solescence Vendor Claims' and [were] credited to [the] liability account called 'Accounts Payable—Vendor Claims' and the latter account is the one whose entries are disclosed in the [corporate ledger account]." Trial Tr. at 96. Mr. Gagnier testified that the liability account had "nothing to do with inventories." Trial Tr. at 97. In addition, the Material Obsolescence Vendor Claims account "is an account that is charged to cost of production and cost of sales which does not enter into the valuation of the incurred cost of inventory." Trial Tr. at 97.

Mr. Gagnier also indicated that plaintiff maintained a performance reporting system. The system measured the performance of the separate divisions within plaintiff by comparing actual performance against the division's profit budget commitment. Mr. Gagnier stated that while the cost of the engine's purchase was reflected in the performance report of the relevant assembly plant, the shortfall payments were not included in this report.

The court finds, therefore, that the plain face of the Agreements and unrebutted testimony regarding the terms of the Agreements demonstrated that shortfall and Special Applications fees were not a component of the subject merchandise's price, but rather an independent and unrelated cost assessed because plaintiff failed to purchase other engines. In addition, uncontroverted trial testimony showed that in all of its internal accounting, plaintiff treated shortfall and Special Application fees separately from the cost for the subject merchandise. Consequently, the court determines that these costs are not part of the price paid or payable for the imported merchandise, and are properly excluded from the determination of the appraisal value of the subject engines.

B. *Dutiable Assists Paid by Plaintiff:*

The remaining issue the court must address is the proper characterization of tooling-related expenses paid on December 1, 1983 by plaintiff to Peugeot in response to two purchase orders. As noted previously, 19 U.S.C. 1401a(b)(1) (1988) defines transactional value as:

> *the price actually paid or payable for the merchandise* when sold for exportation to the United States, *plus amounts equal to—*
>
>     *    *    *    *    *    *    *
>
> (C) the value, apportioned as appropriate, *of any assist*; * * *.

(Emphasis added.)

An assist is defined under 19 U.S.C. 1401a(h) (1988) as:

> (1)(A) The term "assist" means any of the following if supplied *directly or indirectly,* and free of charge or at reduced cost, by the buyer of imported merchandise for use in connection with the production or the sale for export to the United States of the merchandise:
>
> (i) Materials, components, parts, and similar items incorporated in the imported merchandise.

(ii) *Tools, dies, molds, and similar items used in the production of the imported merchandise.*

(iii) Merchandise consumed in the production of the imported merchandise.

(iv) Engineering, development, artwork, design work, and plans and sketches that are undertaken elsewhere than in the United States and are necessary for the production of the imported merchandise.

(Emphasis added.)

Plaintiff asserts that the payments to Peugeot were "indirect" statutory tooling assists under 19 U.S.C. 1401a(h) because there is no difference between plaintiff's "purchasing the tooling [for Peugeot, and its] paying for Peugeot's acquisition of the tooling." Plaintiff's Post-Trial Brief at 5. Plaintiff further claims that the value of the "assists" should be apportioned over the total number of engines contemplated to be imported after the date the "assist" was provided. In total, the number of engines remaining to be imported as of December 1, 1983 was 181,423.

To the contrary, defendant contends that the expenses were not assists because they were in the form of monetary payment. In fact, the payments were part of the price actually paid or payable for the imported merchandise. Further, Customs argues that regardless if the payments were assists or part of the price paid for the merchandise, the payments should be allocated over only the actual number of engines imported.

The court notes that the purchase orders received by plaintiff specifically provided that the payments were "one-time running investment charges" for revising specified engine parts or functions. Tool Purchase Orders, Plaintiff's Exhibit Y. Consequently, plaintiff is correct in asserting the payments were made to cover tooling costs incurred by Peugeot.

However, plaintiff's argument is unpersuasive that payments for tooling expenses can comprise indirect tooling assists under 19 U.S.C. 1401a(h). The statute's express language provides that "tools, dies, molds, and similar item materials" must be *supplied* "free of charge or at reduced cost." 19 U.S.C. 1401a(h) (1988). It does not state that transfers of funds earmarked for tooling expenses, rather than the materials themselves, qualify as assists. Further, understanding the statute to equate payment of money with actual transfer of tooling materials strains the bounds of logic and prudent statutory interpretation. Such an interpretation first assumes—without support—that Congress intended an expansive interpretation of these narrow provisions. The interpretation also permits careful importers to avoid paying appropriate duties. Importers could artificially reduce a product's transaction value simply by drafting sales contracts so that all aspects of the price paid or payable for the merchandise that may somehow be used by the seller for production are excluded from the merchandise purchase price, on the theory they were indirect tooling assists.

The court also notes that Customs' longstanding and consistent practice has been to refuse to treat payments for tooling expenses as assists. Customs has found that, as here, the statutory requirements for an assist were not met because the seller was not supplied with actual tooling. Customs holds that these additional amounts constitute part of the price actually paid or payable for the merchandise. *See* 17 Customs Bulletin 726 (1981). *See also* Headquarters Rul. Ltr. 543595 (Apr. 17, 1986), Headquarters Rul. Ltr. 542812 (July 19, 1982), Headquarters Rul. Ltr. 543882 (Mar. 13, 1987).

Accordingly, the court finds that because plaintiff supplied Peugeot with funds, and neither provided actual tooling nor arranged for another party to supply Peugeot with materials, the payments made by payments were not statutory assists. Instead, they were part of the price actually paid or payable for the subject merchandise.

The last issue the court must address is the proper apportionment of the payments. The court notes first that the fact that these costs do not qualify as statutory assists does not prevent some form of allocation. The court's responsibility is to determine the price actually paid or payable for the subject merchandise. As provided in 19 U.S.C. § 1401a(b)(4) (1988), this price is the "total payment (whether direct or *indirect* * * *) made, or to be made, for imported merchandise by the buyer" to the seller. (Emphasis added.) In addition, 19 C.F.R. § 152.103 (1993) specifies that the price "may be the result of discounts, *increases,* or negotiations * * *." (Emphasis added.)

Therefore, the court must determine which portion of the tooling expenses were directly or indirectly part of the price paid for the subject merchandise. While no recent authority discusses whether tooling costs should be apportioned over the total number of products contemplated to be imported, or over the actual number of items manufactured, case law does provide some direction in this matter.

In *United States v. Border Brokerage Co., Inc.,* 66 Cust. Ct. 639 (1971), the court examined the proper allocation of costs under the former statutory "cost of production" appraisal method contained in section 402a(f) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. § 1402(f)). In that case, Customs appraised the subject merchandise, a single imported model of telephone equipment, as including the value of the manufacturer's design and development costs. Although the expenses were incurred in the production of two models, Customs found that the entire amount was part of the dutiable value of the single imported model. The court, however, found that two models were contemplated to be produced, and "development costs can be properly allocated if there is evidence showing the precise num-

ber of articles contemplated at the time of exportation." *Id*. at 643.[5] The court further noted that:

> when—as here—the number of units contemplated and intended to be produced is known prior to the manufacture of any units, proration of the design and development costs among the known number is, in our view, not only required by *Oxford* but necessitated by logic. For when design and development costs are incurred in producing a particular article of commerce, it makes far more sense to charge the design and development costs against the total number of units known or reasonably anticipated to be produced rather than to load the first unit with all the costs. Otherwise, the first unit would have a cost and price which would be both unrealistic and contrary to the acts of business life.

*Id*. at 643.

Similarly, in this case, the purchase orders dated December 1, 1983 specifically noted the tooling charges were for alterations on the subject 1.6 liter engines. The Agreements, as well as extensive and unrebutted testimony, showed that the parties contracted to produce *at least* 70,000 1.6 liter engines per model year from 1983–1985. As of December 1, 1983, 28,577 engines had been imported, and 181,423 were yet to be purchased. Therefore, uncontradicted evidence demonstrated that the tooling revisions were intended to affect, at a minimum, 181,423 engines. Consequently, these tooling expenses are properly allocated over this number of engines.

It would not only be "unrealistic and contrary to the facts of business life" to apportion the expenses any other way, but would also be simply improper for the court to do so. The court cannot "downsize" the contractual right of tooling modifications to at least 181,423 engines for which plaintiff paid $159,897.00 into the more limited right that alterations were intended to cover only the limited number of engines actually imported. The fact that plaintiff did not eventually receive the full "benefit of its bargain"—alterations to 181,423 engines—does give the court license to lessen the contractual benefits for which plaintiff expended $159,897.00.

Therefore, the court finds that since the evidence shows tooling expenses were incurred in anticipation of production of 181,423 engines, the costs for tooling modifications must be apportioned over 181,423 engines, and not the actual number of engines imported. Once allocated in this manner, these expenses are properly considered part of the price paid or payable for the subject merchandise.

---

[5] The *Border Brokerage* court relied upon *Oxford University Press, Inc. v. United States*, 36 CCPA 102 (1949) for much of its analysis. While *Oxford* is not as directly on point as *Border Brokerage*, it too provides guidance. In *Oxford*, the court found that the evidence did not support allocation of the cost of producing books over 65,000 books, the total number of books anticipated to be printed. Rather, it held that the cost should be apportioned over the number of books actually produced simply because there was nothing in the record from which it could even be implied that 65,000 copies were to be printed. As discussed *infra* in this opinion, substantial evidence here demonstrates that the number of engines anticipated to be imported were contractually determined and not subject merely to the effects of supply and demand.

CONCLUSION

After examination of the testimony and exhibits introduced at trial, statutory and case law, and all briefs submitted by the parties, the court finds that plaintiff overcame the presumption of correctness which attaches to Customs' determination that the subject merchandise's appraisal value should include shortfall and Special Applications fees. The court also finds that while plaintiff failed to demonstrate that tooling and manufacturing costs incurred were statutory assists, these expenses are properly allocated over the number of engines intended to be produced. Customs is directed to reliquidate the subject merchandise accordingly. In addition, interest pursuant to 28 U.S.C. § 2644 (1988) is awarded to plaintiff from the date of filing of the summons until the date of refund.